Epilogues and Struggle for Human Rights. Okay, you can remain at the end. I'm just going to make some introductory remarks that will pertain to both cases that are up today. Each side will be allowed 15 minutes, so as the epilogues, you might want to reserve some of your time for your reply. We ask that you speak up as loud as you can. This is not a microphone, and it's allergy season, so there's some difficulties on hearing, so we would appreciate that. So with that, we will begin with our first case and ask that the epilogues step up and begin. Good morning, Your Honor. And I have a really bad cold, and I can't hear you at all, Counselor. Okay, I'll speak up. And if you want to prod me at times to speak louder, I'll welcome that. It's an invitation you all accept, right? We accept it gratefully. Justice Rockford. Justice Hall. I'm Clint Krislov on behalf of taxpayers of EVAPAT and Independent Voters of Illinois Independent Precincts Organization. The parking deal at issue is structurally unconstitutional on its face, because one, it requires the city to use its police powers to enforce private contracts, the meters payments, and two, it sells or leases or consigns, whatever word you wish, the city's control over the public way and requires the city to compensate CPM for any exercise of its police powers. Those two things are what makes this deal unconstitutional, illegal on its face. The court below upheld direct taxpayer standing, denied derivative standing erroneously, we say, but it didn't really matter because the issue of standing once established allowed us to get to the merits, which is what the court wanted to do. Second, it dismissed our public purpose argument essentially because the tickets that were being transferred to CPM. And then eventually the court granted summary judgment in the view that the limitations on the city's exercise of its police powers was not excessive on its face and could still be asserted in the future by some city administration if, and only by the city corporation council, if the impediment seemed to become excessive in practice. We will argue that the agreement is unconstitutional on its face and its real world operation does substantially impinge on the city's exercise of its reserve powers over the public way. Oh, I'd like to reserve three minutes for reply if I could. The agreement imposes huge penalties. First, the agreement imposes huge penalties on the city's exercise of its reserve police powers. And it does this for at least five different things, which are just normal operating decisions that the city makes, changes to the operating standards of the system, permitting a competing parking facility to open. If the city makes the legislative decision to reduce fines or penalties below ten times the parking meter rates or raise the number of tickets, whether it's the city or the state who raises the number of tickets that are required before your car can be immobilized or before your driving privileges are suspended, those are compensation events. Or permitting exempt persons to park more than six percent of the revenue. Council, if I may, any time the city might exercise its police powers, doesn't it have to go through an analysis each time as to the cost versus the benefit? Exactly. And so this may or may not be a factor in determining parking meter decisions in the future. As part of that equation. It determines every action that the city takes. And that's the other part. Any action that the city takes which could have a material adverse effect on the fair market value of the concession agreement has to be reviewed. And so every aldermanic decision to reduce, to make a loading zone someplace or to change the rates for parking on some lot or to do anything, to ban parking from one street or another, everything that the aldermen would propose now has to be vetted not only for a cost-benefit analysis. Is this A, something we'd like to do? B, what will this cost us in terms of the city having to compensate CPM? And C, what can we afford to pay that? And so very important and good decisions can't be made because they're constrained by having to pay CPM for the mere exercise of routine police powers. And in the original agreement, it was costing on a regular annual basis at least $20 million every year. This is what we are. Is that the figure? That's a figure that you are suggesting is what the city has to pay CPM. But do we have the figures on the other side, what the city has saved or may gain under the contract? To balance what that $20 million cost may really mean. Whatever that, that's just the true-ups. That's just the day-to-day cost of having street cleaning and having meters out of service, having streets out of service, whatever. That's just a day-to-day, that's like maintenance. And if all that was being paid was this $20 million, you'd say, well, 75 times $20 million is $1.5 billion. And so for $1.16 billion that the city got in the first place, if all it did was pay back $1.5 billion over 75 years, that would be a reasonable loan-type deal. But then you have to consider that CPM is also getting $100 million every year from the parking meter revenues. So the fact of the matter is it is a terrible deal. Everybody recognizes it's a terrible deal, but our argument is it's illegal. You may consider it a terrible deal and others as well. I'm just curious, is this unusual? Isn't there a multiplicity of precedents for this type of operation in the city of Chicago? You call it the use of police power to enforce private contracts. But can you not name other instances where this has already existed prior to this parking meter? There are only, the answer is, Justice Hall, no. There are only three, there are only six deals, we think, that have been done nationwide. Three of them were here. One is the Skyway, which is a different type of operation. One of them is the garages, which is under challenge in a separate case. And then there's this. What about the red light? The red line? The red lights. The red light. But the red light, if the city wants to hire a firm to do a service for it, that's okay. The city still controls the intersection. It pays somebody to put up red lights and it collects the revenue from it. The city can hire, the city can outsource buying a pencil rather than making it itself. There's nothing inherently wrong with the city hiring somebody to do something for it. It is entirely different to sell the public way to the control of an outside entity who then has to be paid every time you want to modify the public way in any way. And what was the third example you were going to? This is the third one. The Skyway, the garages, and the meters. Indianapolis Park, they call it Park Indy, is the only deal that we know of that actually went through. But that is different because that is a partnership. It is structured so that on the first X million dollars a month, the parking company gets like 60% and the city gets like 40%. And after the crossover point, they go 40-60. So the city is a partner in that deal no matter how good it gets. And here, this is not that. This is not that way. This is a deal which the city received a payment for once, and CPM then has a cash flow which the city is obligated to protect. This is fundamentally different. This is the only deal that's been like this. And every other city that has looked at it, including New York, rejected doing this type of deal. But CPM isn't the only one who receives revenue. The city, in multiple instances, receives revenue as well from this on an ongoing basis. No. The penalties? The penalties for the parking tickets doesn't make the city a revenue sharer. The city gets, the city is, if Macy's or Marshall Fields sold a parking lot, bought a parking lot from the city, it would not be within the power to say, we're going to use police enforcement for the parking meters in your private lot. Somebody, if the city sells a parking garage. The police enforcement doesn't come with it. Suspension of your license doesn't come with it. Immobilizing your vehicle doesn't come with it. Private parties don't get to buy the Chicago police force to enforce their stuff. I thought that was your position exactly. Pardon? I thought that was your position, that very last sentence that you just said. Yes. They don't get to use the Chicago Police Department in order to protect their private stuff. That is your position, isn't it? Well, everybody gets police protection normally, but you don't get it by buying the city's property. You don't get police enforcement on rolling along ticketing people for not paying your Macy's bill. Is that a narrow view of what the police are doing? I mean, aren't they enforcing their own parking rules and ordinances? No. In fact, it used to be. It used to be that you couldn't, if there was a two-hour limit, get a move after two hours. The whole purpose back when Inga Fricklin devised the parking system, it was to keep things moving. It was to get turnover. CPM now controls it so that you can park there as long as you keep paying CPM. And now under their new mobility thing, it's not in the record, but it's certainly in the public domain, what they do is now you can do it on your phone and you can keep extending it as long as you keep paying CPM. So that what the police do is really they issue tickets and the city must honor CPM's issued tickets. CPM gets to issue the tickets and the city is obligated to enforce those as if they were issued by the city. And if you get more than three of them on that vehicle, your car is immobilized. Macy's doesn't get that kind of a deal. And if you get more than five of them, I believe, your driving privileges in Illinois are suspended. That's a deal that simply you don't get. The other problem that they pose and what they really and what the city is, what everybody on the other side is arguing is if you're right that this is an illegal deal, if you're right, the penalties are huge. And the answer is that the contract, if it is illegal, won't have its penalty provisions enforced. It's possible that we might, I mean, this is all premature, but they've made that argument in their briefs. They're saying, well, if you win, we're going to get like $10 billion from the city that it doesn't have. The answer is that an illegal contract is void ab initio, but on an absolute basis, penalties of that sort are not enforced against anybody, let alone against the city. And so if the city had to pay back the $1.16 billion less, the $300 or so million that CPM has already got profited on the deal, the city could issue a bond for that in a week. And that would be a normal bond. What we're talking about is something fundamentally different from every case that has approved a bond financing to do a public facility of some sort. Bonds are a very limited financing. They're of a specific amount. You borrow, hypothetically, $1.16 billion. You pay it back with an interest rate. There are revenue protections to make sure that the money is paid back and not just diverted. Even in a revenue bond that is not a general obligation bond, the revenues from the facility that are being financed have to go to protect the payback to whatever extent is necessary. Those cases, which are really all the cases that there are, approve routine bond financing. This is something totally different. This is a creature that has never been approved, is not a minor extension, and should not be allowed. Unless you have any other questions, I'd like to reserve the rest of my time for rebuttal. Okay. Thank you, Counsel. Thank you. Oh, I gave Mr. Sperling a copy of the Fiala case, Fiala against Wasco Sanitary District, although it's an unpublished opinion, and we generally hew to the rule that you can't cite an unpublished opinion, but people seem to vary on that. And so I would submit that for the Court's consideration. This is on the standing issue, which basically says the taxpayers have standing to protect against the expenditure of public funds. If I can submit it to the Court, or if you'd like me not to, that's fine too. Any such request should be in writing. Will do. Okay. Thank you. Good morning. May it please the Court, I'm Julian Henricus, and I represent the comptroller of the City of Chicago. Mr. Sperling represents CPM, sitting at counsel tables for me. He and I have divided the issues for which we are primarily responsible today. First, I will explain why plaintiff's home rule claim fails on the merits. Then I will use my remaining time to explain why, in any event, plaintiffs were not entitled to derivative taxpayer standing to pursue that claim on behalf of the city. Mr. Sperling will address direct taxpayer standing as well as other issues. And, of course, both he and I will be happy to answer questions concerning any issues in the case. From the moment that parking meters were first installed in Chicago many decades ago, the city, in the exercise of its police and regulatory powers, has frequently undertaken projects involving metered parking. And some of those projects have resulted in reduced revenue from parking meters. For example, removing parking meters from particular locations has resulted in reduced revenue, as has closing streets to parking for the period needed to make street repairs. Before the city entered into the concession agreement with CPM, the city incurred each of those revenue reductions itself. And for just that reason, the city elected not to undertake such projects in circumstances where the benefits would have been outweighed by the harm from the revenue reduction. Under the concession agreement, CPM paid the city and has assumed other obligations in exchange for the revenue from parking meters for the term of the agreement. But the agreement also specifies that the city retains all its police and regulatory powers. So whenever the city decides to exercise those powers by undertaking a project that results in reduced revenue from parking meters, that revenue reduction is incurred by CPM, not the city. For that reason, Section 14.3 and Article 7 of the agreement require the city to compensate CPM. Yet plaintiffs challenge the validity of those provisions. Specifically, plaintiffs contend that Section 14.3 and Article 7 violate the home rule provision of the Constitution because by requiring the city to compensate CPM for any such financial harm, those provisions of the agreement chill the city's exercise of its police and regulatory powers to undertake the projects for the public's benefit. But nothing in the case law suggests that chilling is the proper standard under the home rule provision, and it plainly is not the proper standard. If it were, then throughout the many decades before the city and CPM entered into the agreement, the city necessarily violated the home rule provision every time it was chilled from undertaking any beneficial project to avoid incurring a reduction in metered parking revenue itself. To suggest that the city violated the home rule provision in all of those circumstances would, of course, be absurd. Moreover, plaintiffs' challenge to Section 14.3 and Article 7 is a facial challenge, which means that those provisions must be upheld unless plaintiffs show that they are invalid in every possible application. But plaintiffs fail to satisfy that burden. It is undisputed that under the agreement the city has, in fact, undertaken many projects that resulted in reductions in metered parking revenue, as evidenced by all the payments the city has made to CPM to compensate for such reductions. And those payments mean, of course, that Section 14.3 and Article 7 have not chilled the city's exercise of its police and regulatory powers in every possible application. Indeed, plaintiffs lack evidence that the city has refrained from undertaking even one project it would have undertaken but for Section 14.3 and Article 7. Therefore, plaintiffs' contention that those provisions of the agreement are invalid on their face fails on the merits as a matter of law. I will now address derivative taxpayer standing with respect to the home rule claim. Before you get to the standing, and I don't know if this was in your subject matter for today, but counsel, in his argument, makes a great deal about the fact that CPM has gained police powers or the benefits of our police enforcement that is not given to any other private entity to protect revenues. Yes, as I understand it, that is their public purpose claim, their claim that the agreement, that Section 7.6A of the agreement violates the public purpose provision of the Constitution. And is that for Mr. Sperling? Well, it is, but I'll be happy to address it. No, that's fine. I'll hold my question. Thank you, counsel. I will now address derivative taxpayer standing with respect to the home rule claim. Again, Mr. Sperling will address direct taxpayer standing as well as the public purpose provision claim. It is well established that without derivative taxpayer standing, a taxpayer cannot bring suit on behalf of a governmental unit to whom she pays taxes. Here, plaintiffs needed derivative taxpayer standing to bring suit on behalf of the city for a refund of the compensation payments that the city has made to CPM pursuant to Section 14.3 in Article 7. Plaintiffs were not entitled to derivative taxpayer standing for several reasons. First, Counts 6 through 9 of their Sixth Amendment complaint reported to allege taxpayer derivative actions, but plaintiffs voluntarily dismissed all of those counts and never sought to reinstate them. Plaintiffs therefore waived any argument that they had derivative taxpayer standing. In any event, the argument is incorrect for two independent reasons. One of the reasons that plaintiffs lacked derivative taxpayer standing is that even if their home rule theory were correct, which it's not, it would not entitle the city to any refund from CPM. This is because whenever the city refrains from undertaking a project that would have affected the meter parking system, the city does not owe and does not pay CPM compensation in connection with the proposed change. And without a payment to CPM, there is no amount that could be refunded to the city. By contrast, whenever the city does undertake such a project and does pay compensation to CPM for a resulting revenue reduction, the city was not chilled from undertaking the project and thus there was no violation of the home rule provision on plaintiffs' theory of liability. Therefore, even on plaintiffs' erroneous theory of liability, there could never be a basis for an order requiring CPM to refund any of the compensation the city has paid it. The other independent reason that the plaintiffs lack derivative taxpayer standing is that only the city's corporation council has the authority to litigate to protect the rights and interests of the city. Sections of both the Cities and Villages Act and Chicago's municipal code specify that the city's corporation council, quote, shall appear for and protect the rights and interests of the city in all actions, suits and proceedings brought by or against it or any officer, board or agreement or department. Provisions much less specific than those were construed by the Supreme Court in the Lyons and Scaccitti cases and by this court in the McKay case as foreclosing taxpayer derivative actions by state and county taxpayers. The provisions pertaining to the city's corporation council should likewise be construed to foreclose taxpayer derivative actions by Chicago taxpayers. In their reply brief, plaintiffs contend that they have taxpayer derivative standing under the Illinois Municipal Code, Section 1-5-1. But that argument is waived because plaintiffs did not rely on Section 1-5-1. On summary judgment in the circuit court or in their opening brief on appeal. In any event, the city has home rule power and thus the city's corporation council ordinance controls over Section 1-5-1 for the reasons that we set forth in our brief. If Your Honor would like me to address the public purpose question, I would. I'm sure it will be addressed by Mr. Sperling. Thank you, Counsel. Good morning, Your Honor. May it please the Court. Robert Sperling, law firm of Winston and Strawn, LLP, on behalf of Chicago Parking Meters, LLC, commonly referred to in this litigation as CPM. Before I begin, Your Honors, I would like to know how much time I'm allowed, since we're over two. Do you have some idea? You have maybe about five to ten minutes, more towards the five. I understand and I will do my best. Thank you. This morning, plaintiffs argued that this is a bad business deal you're hearing today. Unfortunately for plaintiffs, by their own admission, they filed a facial challenge based on the compensation provisions of the concession agreement. A facial challenge required them to prove to the trial court and to this panel that the application of these sections must be unlawful, unconstitutional in all applications. Mr. Henriques has just outlined to you a number of circumstances, and it's in the record, where the city in fact exercised their police powers and paid the true-up payments. That stops plaintiffs in their trails, because that indicates in those circumstances there was nothing unlawful about the delegation of the exercise of police powers. The city, in fact, exercised their police powers. They closed streets. They held street fairs. They cleaned streets. They did what they had to do to perform their responsibilities, and they paid the price based on the formula in the concession agreement. Totally appropriate under the pool decisions and U.S. trust that I'm sure you've seen in the briefs more times than you'd like to characterize. As I go on to deal with direct standing, which I will in a minute, I'd like to first touch on plaintiff's burden, because he fails not only to prove a facial challenge by showing you in all circumstances that disagreement is unconstitutional, but he also fails to deal with the standard articulated by our Supreme Court in Napleton, which indicates there's a presumption in the 1350 Lakeshore Drive case. There's a presumption of validity of the ordinance. There's a presumption that the city council acted properly. He has not provided the trial court nor this panel a single iota of evidence in the record. Remember, he moved for summary judgment. This is not a motion to dismiss case. There is nothing in the record to indicate that the council acted improperly. Therefore, this court, based on the Supreme Court, must presume the validity of the ordinance. I'd like to turn for a second to the public purpose arguments that he has made throughout this case, indicating that this somehow has a private benefit in the mix. And it's kind of his idea is that you take the O'Fallon decision, which dealt with purely private, as you may remember, and you balance off the private and public benefit. Unfortunately for plaintiffs, the public purpose doctrine in this state is articulated in the Constitution and written by the Supreme Court indicates that is not the standard. The standard is as long as there is some public benefit, there is no violation of the Constitution. And I would direct this court to the decision of the Friends of the Park decision by the Supreme Court, which involved, as we all know, Soldier Field, where the Soldier Field financing was challenged and the court there held the public will benefit at Soldier Field and the bearers may have a private benefit and that's okay under the law. I would also direct you to the Empress Riverboat case where the Supreme Court indicated that the horse racing industry was receiving some benefit from the tax involved that was challenged, the expenditure that was challenged there. And they said that was okay because if the horse racing industry failed, people would be out of work. So the standard is not a balancing for this court. The standard is clear that if there is some public benefit, the provision is lawful and constitutional. Plaintiff has failed to meet a burden to challenge the public purpose of the concession agreement. It is totally appropriate. I'd like to turn to direct standing because it's, I'm sorry. I'll go back to the question about using police powers to enforce the parking meter, using the fines to make sure that the revenue continues to flow on the parking meters. Is that an improper? Well, first of all, it's mischaracterized by the appellants, but let me just indicate the answer is yes. The way the deal is structured and what everyone has lost sight of, and I'm not suggesting the court has lost sight of it, but the appellants and plaintiffs certainly have. My client paid $1.15 billion to the city of Chicago, which the city used to cover all types of expenses at their direction, their discretion. There's nothing in the record to ever indicate, as Mr. Kristof would like to suggest, nothing to indicate that more than $1.15 billion is ever going to be paid by the city. That's pure speculation on his part. And your question is, is it okay for the city to pass regulations which create fines for the parking spaces, I think is what you're indicating. Is that correct? Yeah, that's what Mr. Kristof is arguing, I believe. It's totally appropriate because the police power under the agreement was retained by the city of Chicago. They tell us where the meters can be installed. They tell us what the rates can be. We have no discretion there. They have total control of the streets, and if they have an obligation to pass some type of fine, which is sure that their business transaction that CPM entered into in good faith with the city and was told that these were the terms of the deal. Remember, there were multiple bidders. We were the highest bidder. The reason the city structured it that way is because probably, I'm speculating quite candidly, nobody may have bid if there was not going to be enforcement on the streets because people were just going to park in front of meters and not pay. There would be no revenue coming to the successful bidder, and I'm certain that many people would not have paid as much or bid at all had there not been an obligation of the city to at least police the streets. But the question is, is that unconstitutional? We understand how it sweetened the deal, if you will, but the argument is that it is an improper use of police power to utilize that kind of the Chicago police to enforce a private contract. My response would be it's absolutely constitutional, not unconstitutional, and the precedence that I would direct the court to look at the language in Poole v. Kankakee where there was police powers involved that were delegated or restricted, and more importantly, the U.S. Supreme Court decision in U.S. Trust, which talks about contractual rights, police power need not be costless, and how those rights have to be protected. You can't enter into a transaction with a prospective bidder, all right, take a billion dollars plus of their money, and then say, you know what, we're going to turn our backs and do nothing to assist you in achieving anywhere near the revenue projections that we told you you would get when you bid on this contract. That would be inappropriate. That would be inequitable. So the answer to your question is we feel in our briefs we've showed you and proved that it's absolutely constitutional. Or as in other breaches of contracts, CBM could have sent out their own letters, their own notifications in an attempt to collect the revenues, as opposed to utilizing the police power of the city of Chicago. Under the contract, they couldn't do that. They don't have control of the streets, Your Honor. That's a police power function that was withheld by the city of Chicago, and I would suggest properly so. We certainly don't want private parties in contractual agreements taking control of our streets. That would be the worst of all situations. And the private parties have taken control of our meters. And so through a contract, then that's okay. But the meters on the streets, then it's a problem. It's a police power because the police power under Section 3.1 of the concession was withheld by the city of Chicago. We had no right to do so, to do what you're suggesting. And I would add, we can't lose sight of the fact that this is a facial challenge. He must show that every part of this agreement that he's challenged is unconstitutional in every set of circumstances. And that stops their case in its tracks because the fact that Article 7's true up payments have been paid by the city and the city has exercised its police powers, his argument goes away. He cannot succeed. That's what the trial court properly found. You can't lose sight of that. Let me go back to your public purpose argument. In your research, has there been any quantitative definition of the public benefits that need to be accrued in order to meet the standards? From a quantification standpoint, there's nothing in the cases that says it must be X number of percent or dollars. But it talks about there must be some. In this particular case, if we take a step back, the most immediate benefit is the city received $1.15 billion. That would not be a minimal type of public benefit. The city received a revamped pay box system that they didn't have the money to do so people could pay with credit cards, get receipts. Subsequently, as you know from the ordinance that was that they should be asked to take notice of that pay by cell was added. So the public benefits, which are in the record, and I will add there was a Professor Strong of William and Mary, one of the foremost transportation public-private partnership experts in the country, provided a report. He never was deposed or rebutted by the plaintiffs. He indicated all the public benefits of this particular contract. They are far greater than the Friends of the Park case or the Empress Riverboat case, which are Supreme Court cases recently which dealt directly on point. The appellant's attempt to say it's a balancing analysis that this court should do is contrary to the law of the state. If I can go on to direct, then I don't want to use up my time unless there's a question. I want to get the direct standing. Did you have a question? I apologize. No, that's okay. When you were saying the things that happened, I thought about the portability of the ability to move your car with your same ticket from place to place. I unfortunately have to pay. So do I. Yes. No, it just came in. No, but there's an added benefit to business people that no longer have people talking in front of their businesses all day long, like a cleaner or a small business owner. That's another benefit. But if I can direct my attention to direct standing, and I will be brief. If you could just do it in a couple minutes. I'll do this in a couple minutes. We just have another case. Three requirements for direct standing. Plaintiffs fail to meet any of the three. Number one, they must show, because this was a case coming from summary judgment, and they're asking this court to reverse, an actual misuse of public funds by an expenditure. They don't meet that test. The second and third test, they don't even come close to meeting, and that is they must, under well-established Illinois law, and it's in our briefs, I won't bore you, they must show a causal link, a causal link between the alleged, in this case, they must prove, the actual improper expense and an immediate call upon the taxpayers to replenish the treasury. That's the Village of Chatham standard. It's very clear. And the third, which is really ironic, is redressability. They cannot propose a remedy, as these plaintiffs do, that will cause the city, $1.15 billion because they seek the return of some million dollars worth of alleged true-up payments. That violates the redressability standard that is required for direct taxpayer standard. That is in the Lynch decision. It's very clear. These plaintiffs fail on all three elements to show you that they should have direct taxpayer standing. There is nothing in the record, nothing, to indicate that there is a causal, imminent relationship between these alleged improper spending, in this case, it should be actual proof of it because he went for summary judgment and there was no proof, and some call upon the taxpayers for an increase. And the last factor I would add, there's nothing in the record to indicate that the taxpayers would be called upon at all because of the $1.15 billion advance that we paid when we took on the contract. The last point I want to make is a response to a comment that Mr. Krisloff made that is just contrary to the law. He talked about improper, ultra-virus acts and don't worry about it, they won't have to pay back the money if it's an improper contract. That isn't the law in this state. Where parties have acted in good faith, and here the city of Chicago had an opinion of a major law firm saying it was a constitutional agreement, that it was proper and lawful, where they act in good faith, the Barkhausen decision says equity still come into play. If this concession was overturned by some odd reason by this panel, you determined it was wrong, there would be an equitable argument, the cities acknowledge it, CPM's money can't just flow to the city of Chicago. We get thrown out and our money is gone. Contrary to Pellin's argument, the Barkhausen decision says that equity is in fact proper, where people acted in good faith. There is no allegation here that the city or CPM acted in anything but good faith. Thank you and I'll answer any questions you may have. Thank you very much. The case law is very clear on public purpose, Doctor. Contracts always confer a private benefit, otherwise the private entity would not agree to the contract. It's not surprising that the city's contract here conferred a private benefit on CPM. They wouldn't have entered into the agreement if it didn't. There's no magic to the fact that the benefit here is the use of the city's police power. There's no case law at all that says that the use of the police power is inappropriate. Whatever benefit the city confers, whether it's police power or otherwise, is a proper benefit. Here, the public benefits are enormous and dwarf the private benefits to CPM. Okay, thank you, counsel. I understand. Mr. Krisloff, I'll give you a few more minutes. I know that they've gone over. The whole idea that they wish to say is you can't do derivative standing, you can't do taxpayer standing, no matter what, you can't get there. The city is contractually obligated to defend the contract, so if you accept all their arguments, nobody would be able to challenge the contract, which is what I believe their purpose is. But the fact is direct taxpayer standing arises from an expenditure, an illegal expenditure or an expenditure under an illegal contract. We don't have to show that the taxpayers will have to immediately pay for that. That's when Mr. Sperling says it's very clear, that's the trigger that it isn't true. It just doesn't, the test doesn't require that. We get direct taxpayer standing to contest an expenditure that's going to be made. We get derivative standing to go after an expenditure that has been made to recover it. We have both. But we, this business about voluntarily dismissing, we did it to accommodate the court. The court said you've got direct taxpayer standing and I'm convinced that if you get standing and it's illegal, you'd be able to get the money back. That was done when we were seeking an injunction against the city paying the money. And he basically went to the merits and said, I'm sure if you win, you'll get it all back, and if you don't, you won't. This idea that it need not be cost, that the exercise of police powers need not be costless, well, that doesn't mean that every exercise can be charged. You're going to put a toll on the exercise of every exercise of police powers. That is a chilling effect. Their argument is, well, if they've ever expended the money, that action wasn't chilled. But there were others that were. In fact, right at the beginning, the city had to give back a grant of, I believe, $150 million from the federal government that it had applied for and received, which is to cut down on vehicular traffic in the loop, which was to encourage mass transit. The city had to give that back because it conflicted with the parking meter lease deal and the city would have had to compensate CPM for that. This exclusivity argument that they make based on Lyons and Skitchitty, I know the Skitchitty case, that's one of ours, and those are based on the Illinois Constitution's designation of the attorney general as the exclusive representative of the state and the state's attorney as an exclusive representative of the county. There are a slew, literally, cited in our reply brief at page one. Seems a good place to start. City of Chicago Actuarial Cone versus Keene. Chicago Actuarial Constantinos versus Duncan Traffic Equipment over the meters when there was that other snowstorm that we've now forgotten about by now. There is taxpayer standing to recover, to pursue, to prevent the expenditure, direct, and to recover, derivative. The mere statement that the city retains its police powers doesn't make it so when the city has to pay for its exercise. Every statement in a contract doesn't make that the defining event when the rest of the facts of the contract are you have to pay to exercise it. Now, it is one thing to say that the rates, you know, Mr. Sperling said the city can do whatever it wants with the rates. If the city reduces the rates, it's going to have to pay under the contract. In fact, the rates are set by the contract for the first four years in basically quadrupling them and then increasing them after that by the cost of living. The rates are set by the contract, and the city cannot reduce the rates and the fines. These are fines for the parking ticket penalties. They can't reduce those to less than 10 times parking rates without compensating. The enforcement is not, it's not just as if we're worried about people being murdered by the parking meters. They get specific city of Chicago enforcement. The city is required to honor CPM's tickets as if it were the city's own and to due to people who don't pay CPM, to treat them as people who should have their vehicles immobilized and their driving privileges suspended. In fact, if the state changes the number of tickets before you can have your driving privileges suspended, increases that, the city has to pay compensation for that too. While the police power need not be costless, it can't be subjected to a toll charge either. There's all these benefits, the city got a revamp system, the city could have paid 35 million to the $35 million that was the cost of putting, rolling out the revamp system. Could have done that itself. Professor Strong's report, we didn't depose him. I admit that. He was only available to us like two days out of six months, and we felt that his opinion on its face falls because he says this is state of the art, this is the norm, it's not. If you look at the deals that he cites, no other deal is like this one. If you want an opinion that is an unpaid for, honest opinion of how these deals work and their legality, look at the articles that are cited. Professor Royne says this is the same thing. The same justification can be made for leasing out the property tax system of the city and the income tax system of the state. You sell those, sell the cash flow, and any change that you want to make thereafter, you've got to pay your way out of it. You cannot, cannot. The problem is not that are there little things that might be a benefit? Maybe. Maybe there's some little benefits here and there. But the fact of the matter is you can't sell the public way. You can't sell the public governmental regulatory function. I would just ask if you would sum up, Mr. Griswold. Thirty seconds? Sure. The argument that an improper alter virus contract, that there are equities involved? Okay, I'll grant that. And if this court finds that the transaction is illegal, unconstitutional, in some major factor, then maybe equity will determine what the redress is. Maybe our argument will work that void admonitio means, you know, howdy stranger, everybody is presumed to know the law. I don't care if you get a big firm to write you an opinion. That generally is only a function of paying somebody. That doesn't make it the law. Everybody is presumed to know the law. They were on notice that this deal was illegal when they wrote it. And the court below will deal with it in an equitable fashion. For those reasons, we ask that the court reverse the decision below and remand the case for further proceedings. Thank you. Thank you, counsel. The matter will be taken to re-advisement.